**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | |
|---|---|
| SIERRA CLUB, )<br><br>Plaintiff, )<br><br>v. )<br><br>ENERGY FUTURE HOLDINGS CORPORATION )<br>and LUMINANT GENERATION COMPANY, )<br>LLC )<br><br>Defendants. ) | Case No.: 5:10-cv-00156-MHS-CMC |

**SIERRA CLUB'S CORRECTED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**FINDINGS OF FACT**

1.  Energy Future Holdings Corporation ("EFH") is an operator of the Martin Lake power plant, and Luminant Generation Company LLC is an owner and the operator of the Martin Lake power plant.  Both are obligated to operate the plant in accordance with the requirements of the Clean Air Act ("CAA").

2.  Martin Lake is a three-unit, coal-fired power plant in Rusk County, Texas.  The power plant consists of three distinct but essentially identical coal-fired boiler unites (Unit numbers 1-3).

3.  The Texas Air Control Board issued construction permits for the Martin Lake Plant's three coal-fired boilers on October 9, 1973 (Units 1 and 2) and November 22, 1974 (Unit 3).  The three units at the Martin Lake Plant became operational in 1977, 1978, and 1979, respectively.

1

4.  All three Martin Lake units are tangential, dry bottom units rated nominally at 750 MW.  The units were originally designed to burn only Texas lignite from a local mine.  However, starting in the mid-1990s, they have also burned sub-bituminous coal from the Powder River Basin.

5.  The units have electrostatic precipitators ("ESPs") and wet flue gas desulfurization ("FGD") units to control particulate matter (PM), which causes opacity, and sulfur dioxide emissions, respectively.

<u>OPACITY VIOLATIONS</u>

6.  Martin Lake is subject to an opacity limit of 20%, averaged over six minutes.  30 Tex. Admin. Code § 111.111(a)(1)(B) (as approved by EPA on May 8, 1996 and effective on June 7, 1996 (61 Fed. Reg. 20,734)).  The Martin Lake CAA Title V Operating Permit independently references and mandates compliance with this Texas state implementation plan ("SIP") requirement.

7.  The term "opacity" refers to the extent to which a plume of smoke reduces the transmission of light and obscures vision.  For example, a plume with 20% opacity blocks 20% of light passing through it, and a plume with 100% opacity is completely opaque so no light passes through it.

8.  Opacity is an indicator of the excessive levels of particulate matter being emitted by a facility.  Essentially, opacity measures the level of soot in a facility's exhaust.

9.  Federal requirements further include mandatory monitoring of Martin Lake's opacity emissions using continuous opacity monitors ("COMs") and mandatory reporting of any and all exceedances of its 20% limit.  40 C.F.R. § 60.7; 30 Tex. Admin. Code §§

122.145(a)(1)(D), (F) (as approved by EPA on April 28, 2009 and effective on May 28, 2009) (74 Fed. Reg. 19,144)).

10. Accordingly, Defendants submit quarterly verified reports to the Texas Commission on Environmental Quality ("TCEQ") that list exceedances of its opacity limit based on the company's own COMs monitoring data.

11. Between July 26, 2006, and December 31, 2012, Defendants reported 31,289 six-minute periods during which emissions from Martin Lake averaged more than 20% opacity. Because one six-minute period of excess opacity per hour may have been allowable under the EPA-approved Texas regulations at 30 Tex. Admin. Code § 111.111(a)(1)(E), Sierra Club does not challenge the first six-minute exceedance each hour.  Excluding these 6,178 exceedances, 25,111 exceedances remain.

12. Defendants' own monitoring data show a total of 11,060 opacity violations in less than two years (between July 2006 and April 2008).

13. Defendants' more recent data show that the company's opacity violations are ongoing. Between May 1, 2008 and December 31, 2012, Martin Lake exceeded its 20% opacity limit at least 14,051 additional times.

<u>HEAT INPUT VIOLATIONS</u>

14. On February 7, 1985, the Texas Air Control Board (predecessor to TCEQ) sought additional information necessary for the issuance of Martin Lake Permit Nos. 933, 934, and 2716. TACB specifically requested "the maximum heat input (Btu/hour) to the boilers." *Id.*  Texas Utilities Generating Company (predecessor to Luminant) replied:

> A review of our performance tests for these units indicates the maximum heat input at full load to be 8,523.6 million BTU/hour.  This value is based on measurements taken during a METCO Performance Test Report dated June 1983. . . . This number should be typical of maximum heat input for all three units.

Letter from TUGC to TACP (Feb. 22, 1985).

15. Defendant's 2003 Renewal Application for Martin Lake Permit No. 933 references the 8,530 mmBtu/hr limit no fewer than 5 times. In doing so, Defendants expressly acknowledged the direct relationship between heat input values and the mass emission limits contained in its permit.

16. A coal-fired boiler's heat input rate is directly related to the rate of fuel (coal) combustion in that boiler. As such, it is a measure of the boiler's size or capacity, and it is correlated to the amounts of various combustion-generated pollutants the boiler can emit. Thus, heat input limits are one of the most important constraints on emissions of numerous pollutants, including, but not limited to, particulate matter, sulfur dioxide, mercury, and carbon dioxide. In short, higher heat input, if other operating parameters are constant, results in more emissions of these pollutants.

17. TCEQ incorporated Defendant's Martin Lake heat input representation in drafting Permit No. 933, relying on the 8,530 mmBtu/hr figure as a multiplier in calculating the facility's hourly allowable emission rates. The hourly emission limits contained in Permit No. 933 (as incorporated in Martin Lake's Title V permit) assume a maximum heat input of 8,530 mmBtu/hr and remain in effect today.

18. For example, Permit No. 933 limited the facility's hourly allowable emission rate for PM to 853 lbs/hr and its hourly allowable sulfur dioxide emission rate to 10,236 lbs.hr. These hourly emission limits are simply the products of the maximum hourly heat rate represented in Defendant's application (i.e., 8,530 MMBtu/hr) multiplied by separate regulatory emission factors or limit 0.1 lb/MMBtu (for PM10) and 1.2 lb/MMBtu (for sulfur dioxide).

4

19. Between July 26, 2006, and December 31, 2012, Luminant reported an hourly heat input in excess of 8,530 MMBtu/hr per unit during 31,207 hours at Martin Lake.

20. These exceedances are documented in Defendants' own submissions and compiled by EPA through its "Clean Air Markets" database.

STANDING

21. Sierra Club is a membership organization that works to restore the quality of the natural and human environment, including by advocacy and litigation on clean air issues.  Sierra Club has the specific goal of improving air quality throughout the State of Texas and its 254 counties.  One of the Sierra Club's main areas of environmental concern involves air pollution from coal-fired power plants, particularly because they are the largest sources of industrial pollution in Texas.

22. Three local members of the Sierra Club are standing witnesses in this case – Wilton Adams, Wendy Gomez, and Eddie Gomez.  Mr. Adams owns and runs an auto salvage business about a mile from the Martin Lake power plant.  The Gomezes, who are married to each other, live six miles from the plant.  All three are being injured by Defendants' pollution from Martin Lake.  All three were members when this case commenced on September 2, 2010, and continue to be Sierra Club members.  Each of these members are harmed by excess and unlawful emissions from the Martin Lake power plant, and such injuries would be redressed by an order requiring Defendant to bring the plant into compliance with CAA opacity and heat input requirements.

23. Mr. Adams can see the smokestacks at the Martin Lake power plant from his salvage yard. During the day, he sees smoke or steam, sometimes as a long streak against the sky.  He has also observed bluish/grayish colored smoke coming from the plant.  Sometimes he sees a

5

rusty colored smoke accompanied by a tremendous roar that lasts several minutes.  Mr. Adams states that a gray film constantly covers the cars, houses, and patio furniture in the area surrounding the Martin Lake power plant, including his property.  The gray film is evident for miles around the plant.  The gray film is a grayish color about like you would get from ash.

24. Mr. and Mrs. Gomez each drive near the plant eight or more times each month.  They see grey, bluish, and white emissions from the smokestacks.

25. The standing witnesses' undisputed testimony is consistent with the opacity and heat input violations at issue in this case.

INJUNCTION

26. Defendants' opacity and heat input violations worsen the air quality around the plant, increasing emissions of particulate matter, a pollutant for which the weight of scientific evidence suggests there is no healthful ambient concentration.  The fly ash particles that cause opacity at Martin Lake also include toxic metal particles such as arsenic, lead, cadmium and mercury.  Heat input violations also increase sulfur dioxide emissions.

27. EPA has "conclude[d] that a **causal relationship** exists between both long- and short-term exposures to [fine particulate matter] and premature mortality and cardiovascular effects and a likely causal relationship exists between long- and short-term [fine particulate matter] exposures and respiratory effects.  Further, there is evidence suggestive of a causal relationship between long-term PM2.5 exposures and other health effects, including developmental and reproductive effects (e.g., low birth weight, infant mortality) and carcinogenic, mutagenic, and genotoxic effects (e.g., lung cancer mortality)."  National Ambient Air Quality Standards for Particulate Matter; Final Rule, 78 Fed. Reg. 3086, 3103

(Jan. 15, 2013) (emphasis added).  Further, there is no exposure threshold below which negative health effects from fine particulate matter do not occur.  *Id.* at 3098.

28. Opacity violations would be eliminated if Defendants implemented the control measures outlined by Sierra Club's expert witness, Dr. Ranajit Sahu.  These control measures include:

   a. Adequately designed and properly sized electrostatic precipitators that would control PM and opacity for all periods when the ESPs are energized (including periods of startup and shutdown).

   b. New, full-size baghouses, in addition to or in lieu of the existing ESPs that would control PM and opacity emissions during all periods, including startups, shutdowns, and maintenance periods.

   c. Use of cleaner-burning fuels such as natural gas (in conjunction with a properly sized and maintained ESP or baghouse), instead of oil during startups would result in lower opacity and PM. In fact, the use of natural gas until the ESPs are fully energized could virtually eliminate ash loading and the resultant high opacity and PM levels during these periods.

29. Heat input violations would be eliminated if Defendants were enjoined from burning coal at a rate greater than 8,530 MMBtu/hr.

30. Defendants can implement these control measures without compromising the electricity supply.

PENALTIES

31. For 2012, Defendant Energy Future Holdings, Inc. reported operating revenues of $5.636 billion to the U.S. Securities and Exchange Commission.

32. Defendants have long known about the significant under-performance of the ESPs and exceedances of opacity limits at the Martin Lake Plant.

33. Defendants have not made changes at the Martin Lake Plant that would bring the plant into compliance with opacity and heat input limits.  Thus, the ongoing exceedances are business as usual for the Defendants.

34. Economic benefit under the Clean Air Act, 42 U.S.C. § 7413(e)(1), represents the financial gain that a violator accrues by delaying or avoiding necessary pollution control expenditures. This gain may be calculated by comparing a scenario of on-time compliance with environmental regulations with the actual, or non-compliance, scenario.

35. At Martin Lake, Defendants avoided operation and maintenance expenditures needed for compliance with air pollution control requirements at a rate of $5 million per year during the period of noncompliance.

36. The economic benefit of these avoided operation and maintenance expenditures from July 1, 2007 to July 1, 2013 was $27.4 million.

37. At Martin Lake, Defendants delayed capital expenditures needed for compliance with air pollution control requirements of $180 million starting on July 1, 2007.

38. In the alternative to the operation and maintenance expenditure calculation above, the economic benefit of the delayed capital expenditures from July 1, 2007 to July 1, 2013 was $ 49.1 million.

39. The economic benefit methodology presented to the Court by Defendants' economic expert relies on an unrealistic operating scenario that assumes that the plant experiences no unplanned outages or planned shutdowns for maintenance or repair.

40. The economic benefit methodology presented to the Court by Defendants' economic expert is rejected.

AFFIRMATIVE DEFENSES

41. 30 Tex. Admin. Code §§ 101.222(d)(2) and (e)(2) provide that the affirmative defense is not met unless the "opacity was caused by a sudden, unavoidable breakdown of equipment or process beyond the control of the owner or operator; . . ."  Many of the high opacity events at

Martin Lake occur (i) during the shutdown process; (ii) during startup; or (iii) during other times when the boiler is "unstable" due to fuel related issues; (iv) when ash hoppers are over-filled; (v) when one or more sections of the ESPs routinely trip; or (vi) when rain water intrusion via holes in the ESP affects ESP operation, etc. – none of which is "sudden" or "unavoidable." In addition, the causes mentioned are all within the control of the operator.

42. 30 Tex. Admin. Code §§ 101.222(d)(3) and (e)(3) provide that the affirmative defense is not met unless "the opacity did not stem from any activity or event that could have been foreseen and avoided or planned for, and could not have been avoided by better operation and maintenance practices or by technically feasible design consistent with good engineering practice; . . ." The Martin Lake control equipment design itself is inadequate, and the control equipment is inadequately operated and maintained.

43. The inability to properly control emissions of opacity and PM during shutdown and startup events (which routinely occur at each Martin Lake unit) cannot be blamed on the event (tube leak, fan or pump trip, etc.) that initially led to the shutdown and the later startup. The root cause lies in the underlying inadequate pollution control equipment capacity.

44. Further, Defendants have not demonstrated that the event that caused the shutdown and the later startup was unavoidable and could not have been prevented by better design or maintenance practices.

45. The Martin Lake ESPs are inadequately designed, have inadequate available collection area to collect charges particles, are not properly maintained – and, as a result, have little margin to properly handle the emissions of PM and opacity for the type of coal blend that is burned at Units 1-3.

9

46. The ESPs were inadequately sized even for the original use of 100% lignite coal. The Martin Lake units currently burn various blends of local lignite and western sub-bituminous coals from the Powder River Basin, which has a lower sulfur content than lignite. The current blends of Powder River Basin and lignite coal produces ash that is more difficult to collect, exacerbating the sizing issue and further hindering the ESPs' performance.

47. Defendants hired outside contractors to inspect the ESPs for each unit at Martin Lake, and it is clear from the inspection reports that the ESPs were not maintained in a timely or proper manner. This lack of maintenance affected the ability of the ESPs to properly control particulate matter thereby leading to increased opacity emissions. This neglect exacerbated the original design flaws in the control equipment.

48. Plant operators failed even to ensure basic weather protection for the ESPs at each unit. The inspection reports are rife with references to holes in exterior equipment, water intrusion, and air in-leakage – reducing ESP efficiency, accelerating corrosion, and contributing to an overall degradation in the condition of the ESPs. Nor did plant operators undertake basic, inexpensive, measures to maintain ESP efficiency such as promptly evacuating ash from all hoppers. High ash levels are cited time and again in the inspection reports, which contributes to opacity exceedances and secondary equipment malfunctions (dislodged wires, structural damage, etc.).

49. Further, because the air pollution control equipment sizes have remained unchanged since the original design based on the 8,530 MMBtu/hr heat input, their capacity to handle increased emissions from the boiler has diminished as boiler heat input as increased.

50. Undersized and poorly designed ESPs which are also improperly maintained are incapable of sufficiently controlling PM emissions, especially during startup/shutdown. Not only have

Defendants failed to install additional collection surface area in the Martin Lake ESPs to accommodate blending with low-sulfur-coal, Defendants have failed to fully utilize what collection surface area they do have as a result of their poor maintenance.  Baghouses, on the other hand, filter PM and control opacity even during MSS periods.

51. The reports issued by TCEQ for the reported opacity events do not reflect the findings of reliable agency investigations.  As Michelle Baetz, Air Section Manager, TCEQ, Region 5 – Tyler, confirmed, TCEQ:

(1) **Did not obtain any other investigation material** other than the notification reports sent by Defendants;
(2) **Did nothing to verify the accuracy** of the notification reports;
(3) **Did not obtain any other information** beyond what was already contained in the notification reports and in existing TCEQ files:
(4) **Did not inspect any equipment** as part of the investigations;
(5) **Did not perform a site visit** as part of the investigations; and
(6) **Did not conduct any interviews** as part of the investigations.

52. In other words, TCEQ's purported investigations consisted entirely of a review of the notification reports prepared and sent by Defendants to the state agency.

53. It is clear from a review of the reports and Ms. Baetz's answers to direct questions about how the reviews were conducted that no real investigation or evaluation took place.  The agency repeats conclusory findings in report after report for opacity event after opacity event.  TCEQ did not require any proof by the plant to demonstrate that the affirmative defense criteria were met.  EPA's approval of the portion of the Texas SIP revision providing an affirmative defense against civil penalties for unplanned SSM events - as upheld by the Fifth Circuit - requires the plant in an enforcement proceeding to shoulder the burden of proof on all ten demonstrative criteria, and the STEERS and Quarterly Reports submitted by Luminant for Martin Lake make no claims of the affirmative defense.

**CONCLUSIONS OF LAW**

1.  This Court has subject matter jurisdiction under the Clean Air Act, 42 U.S.C. § 7604 (citizen suit provision), and the federal jurisdiction statute, 28 U.S.C. § 1331 (federal question jurisdiction).  The relief requested is authorized pursuant to 42 U.S.C. § 7604 and 28 U.S.C. §§ 2201, 2202.

2.  In compliance with 42 U.S.C. § 7604(b)(1)(A), Plaintiff notified all the requisite parties and waited more than 60 days after serving such notice before filing this suit.

3.  Prior to the commencement of this lawsuit, neither EPA nor TCEQ commenced diligent prosecution of a court action to redress Defendants' ongoing violations.

4.  Both Sierra Club and Defendants qualify as "persons" under the CAA.  42 U.S.C. § 7602(e) (including "an individual, corporation, partnership, association. . .").

5.  Under the CAA, "[t]he term 'owner or operator' means any person who owns, leases, operates, controls, or supervises a stationary source." 42 U.S.C. § 7411(a)(5).

### STANDING

6.  Wilton Adams, Eddie Gomez, and Wendy Gomez have standing to sue in their own right for violations of emission standards and limitations at the Martin Lake Plant.

7.  The Sierra Club has standing to bring this suit on behalf of its members Wilton Adams, Eddie Gomez, and Wendy Gomez.

8.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 827-28 (5th Cir. 1997).

9. As to "standing to sue in their own right," the Supreme Court has held that to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992); *see also McCall v. Dretke*, 390 F.3d 358, 361 (5th Cir. 2004).

10. Standing may be based on members' "reasonable concerns" about the effects of pollution on "affiants' recreation, aesthetic, and economic interests," *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv (TOC), Inc.,* 528 U.S. 167, 183-84 (2000).  Further, the Fifth Circuit and its district courts have found standing in air quality cases based on a variety of other injuries. *Texas United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (odors correlated with direct observation of smoke); *Concerned Citizens Around Murphy*, 686 F. Supp. 2d 663, 671 (E.D. La. 2010) (Plaintiff group's members "demonstrate a cognizable injury by showing that breathing, smelling and being reasonably concerned about the health effects of polluted air diminish their use and enjoyment of their property"); *St. Barnard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C.*, 354 F. Supp. 2d 697, 702 (E.D. La. 2005) ("[P]laintiffs can demonstrate a cognizable injury by showing that they breathe and smell polluted air") (citations omitted).

11. Mr. Adams wants the Martin Lake power plant's smokestack to be as clean as possible.  The Gomezes both want pollution from the Martin Lake power plant to stop.  The Gomezes want the plant to meet EPA standards.  The Gomezes are concerned about sulfur dioxide and mercury.  All three standing witnesses want to see clear skies.  These concerns, including

aesthetic concerns regarding clear skies, support standing in a citizen suit. *Laidlaw*, 528 U.S. at 183-84.

12. The witnesses' observations of air pollution, health concerns, and direct impacts on their property have led to concrete impacts on the declarants' use and enjoyment of their property. These impacts easily meet standing requirements set forth by the Fifth Circuit, which has held that "injuries need not be large, an identifiable trifle will suffice." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 558 (5th Cir. 1996), (citing *Save Our Cmty. v.U.S. EPA*, 971 F.3d 1155, 1161 (5th Cir. 1992) and *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.3d 64, 71 (3rd Cir. 1990)).

13. Regarding air pollution, the Second Circuit has found injury in fact, in part, because, like Mr. Adams and the Gomezes, the plaintiff had "no choice but to breath the air where she lives and works. *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002). Under the standards announced by the Fifth Circuit in *Sierra Club, Lone Star Chapter* and by other federal circuits, the injuries described by Mr. Adams, Ms. Gomez, and Mr. Gomez are easily more than an "identifiable trifle," and constitute injury in fact for purposes of standing.

14. Increased particulate matter, sulfur dioxide, and mercury resulting from the Martin Lake opacity and heat input rate limit violations cause or contribute to the types of injuries alleged by the standing declarants. That level of traceability is all that is required to demonstrate that the individual standing declarants would be eligible to sue in their own right. *See Sierra Club, Lone Star Chapter*, 73 F.3d at 558 (quoting *Save Our Cmty. v. U.S.EPA*, 971 F.2d 1155, 1161 (5th Cir. 1992)); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) ("Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or

14

contributes to the kinds of injuries alleged in the specific geographic area of concern."); *Am. Canoe Ass'n, Inv. v. City of La. Water & Sewer Comm'n*, 389 F.3d 536, 543 (6th Cir. 2004) (finding injury fairly traceable because affidavits stated that river had unpleasant odor, defendants exceeded effluent limitations on numerous occasions, and "these specific types of effluent discharges could cause conditions similar to that complained of").

15. "To demonstrate redressability, a party must show that a favorable court judgment is likely to relieve the party's injury." *WildEarth Guardians v. Public Service Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012) (quoting *City of Hugo v. Nichols (Two Cases)*, 65 F.3d 1251, 1264 (10th Cir. 2011).

16. An injunction ordering Defendants to comply with the opacity limit will redress Sierra Club members' aesthetic, health, and recreational injuries caused by the unlawful emissions from Martin Lake.  Further, an injunction ordering compliance with the heat input limit will eliminate the heat input violations at the plant and address concerns regarding other pollutants emitted in excess quantities as a result of these violations.  Therefore, the injunctive relief sought by Plaintiff meets the redressability prong of the standing test.

17. Plaintiff also requests that this Court assess a civil penalty against Defendants for their CAA violations.  Civil penalties alone provide a basis for redressability, as they deter violations and "afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct." *Laidlaw*, 528 U.S. at 186.

OPACITY VIOLATIONS

18. Defendants violated the opacity limit in the Texas SIP more than ten thousand times in two years and continue to do so today.  Defendants have also violated the Martin Lake CAA Title

15

V Operating Permit, which incorporates this requirement.  Therefore, Defendants are liable under the CAA.

## HEAT INPUT VIOLATIONS

19. Martin Lake's three units routinely exceed the plant's 8,530 mmBtu/hr heat input limit in violation of Permit 933's General Condition, Title V Federal Operating Permit No. O53, 42 U.S.C. § 7661a(a), 30 Tex. Admin. Code § 116.116 of the Texas SIP, and 30 Tex. Admin. Code § 122.143(4).  This Court finds Defendants liable for these violations under the CAA.

20. Under the Texas SIP, "representations with regard to . . . operation procedures in an application for a permit" are conditions upon which a permit is . . . issued" and a permit holder may not vary from such representation without obtaining a permit amendment if the change will cause "an increase in the emission rate of any air contaminant."  30 Tex. Admin. Code § 116.116(as approved by EPA at 68 Fed. Reg. 64,543 (Nov. 14, 2003)); 40 C.F.R. § 52.2270(c) (listing Texas regulations contained in the federally-approved SIP).

21. This constraint is echoed in the terms of Martin Lake's Air Quality Permit: "All representations regarding construction plans and operation procedures contained in the permit application shall be conditions upon which the permit is issued."  Permit No. 933, General Condition 1.

22. As a "permit term or condition," such representations also qualify as "emission standards or limitations" under the Act, 42 U.S.C. § 7604(f)(4), and may thus be enforced through a CAA citizen suit.  42 U.S.C. § 7604(a).

23. Because heat input measures a boiler's rate of coal combustion – signifying its operational capacity – Defendants' heat input assertions for the Martin Lake units qualify as

16

"representations with regard to . . . operation procedures in an application for a permit."  30 Tex. Admin. Code § 116.116.

24. The entirety of Permit No. 933, with the represented maximum heat input included, is incorporated by reference into Martin Lake's Title V permit and enforceable under it.

25. This conclusion is buttressed by the 8,530 mmBtu/hr maximum heat input's expression as an objective numerical value.  *See United States v. Ethyl Corp.*, 761 F.2d 1153, 1157 (5th Cir. 1985) (finding "no trouble labeling the regulations as emission rather than work practice standards" since the regulations set a "purely numerical discharge requirement"); *Natural Res. Def. Council v. U.S. Envtl. Prot. Agency*, 489 F.2d 390, 394 n.2 (5th Cir. 1974) ("The terms 'emission limitation' or 'emission standard' mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis").

## CAUSATION

26. The CAA provides strict liability for civil violations, which are subject to monetary penalties and injunctive relief.  42 U.S.C. § 7413(b) (federal enforcement); *id.* §§ 7604(a)(1), (f)(4) (citizen suit provision); *see also* H.R. Rep. No. 95-294, at 70 (1977) ("[W]here protection of the public health is the root purpose of a regulatory scheme (such as the Clean Air Act), persons who own or operate pollution sources in violation of such health regulations must be held strictly accountable.").

27. Indeed, the strict liability character of the CAA has been repeatedly recognized by the courts. *See, e.g.*, *Pound v. Airosol*, 498 F.3d 1089, 1097 (10th Cir. 2007) ("The [CAA] imposes strict liability upon owners and operators who violate the Act."); *United States v. Anthony Dell'Aquilla, Enter. & Subsidiaries*, 150 F.3d 329, 332 (3d Cir. 1998) (same); *United States*

*v. B & W Inv. Prop.,* 38 F.3d 362, 367 (7th Cir. 1994) (same); *United States v. Hugo Key & Son, Inc.*, 731 F. Supp. 1135, 1140 (D.R.I. 1989) (violations of the provisions of the CAA result in strict liability).

28. Therefore, Defendants' own reports, which show that the Martin Lake plant has violated the 20% opacity limit in the Texas SIP at least 11,060 times between July 2006 and April 2008 and the heat input rate limit at least 24,857 times between July 2006 and January 2009, are conclusive evidence of liability under the CAA. *See, e.g.*, *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 679-80 (E.D. La. 2010) (company's unauthorized discharge reports demonstrated that defendant violated emission standards or limitations promulgated under the CAA and Louisiana's SIP on 19 occasions); *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C.*, 399 F. Supp. 2d 726, 733 (E.D. La. 2005) (holding defendants liable for violations of benzene emissions in its CAA permits based on company's unauthorized discharge reports, even though state environmental agency declared that the reported violations are not actually violations); *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C.*, 354 F. Supp. 2d 697, 707 (E.D. La. 2005) (company's unauthorized discharge reports demonstrated that defendant violated emission standards or limitations promulgated under the CAA and Louisiana's SIP on 34 occasions); *Sierra Club v. Pub. Serv. Co. of Colo. Inc.*, 894 F. Supp. 1455, 1459 (D. Colo. 1995) (since CAA establishes a regime of strict liability, the company's own reports may provide conclusive evidence of emissions compliance); *United States v. Ben's Truck & Equip., Inc.,* Civ. S-84-1672 MLS, 1986 WL 15402, at *3 (E.D. Cal. May 12, 1986) (holding that plaintiff must establish only that CAA standard is not met in order to prove a defendant is liable because "[s]trict liability is essential to meet the purpose of the Act to protect and improve

the quality of the nation's air"); *Friends of the Earth v. Potomac Elec. Power*, 419 F. Supp. 528, 533 (D.D.C. 1976) (summary judgment in CAA citizen suit regarding opacity violations granted on review of defendant's records) .

29. Contrary to Judge Smith's holding in *Sierra Club v. Energy Future Holdings Corp. and Luminant Generation Co. LLC.,* Civ. Action No. 6:12-cv-00108-WSS, causation is not a separate element of proof to establish liability in a CAA case.  *See also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 569 (5th Cir. 1996) (upholding summary judgment on CWA liability where there was no dispute that defendants discharged pollutant into Galveston Bay without a permit; no separate element of proof on causation). Judge Smith relied on dicta from *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.,* 207 F.3d 789 (5th Cir. 2000), for his position.  In *Texans United,* the Fifth Circuit held that the plaintiff association had standing to sue.  In examining the traceability prong of the test, the court held that Texans United did not have to establish CAA violations on the occasions that the standing affiants suffered harm from the defendant's emissions. The court went on to state that, "[a]lthough[] Texans United must ultimately establish causation if they are to prevail on the merits, they need not do so to establish standing."  *Id.* at 793.  On remand, the case was settled before trial, and the Fifth Circuit has not had an opportunity to clarify its statement regarding "causation."

AFFIRMATIVE DEFENSE

30. Between July 1, 2006 and January 10, 2011, the Texas SIP contained no defense to any kind of enforcement action for excess emissions caused by maintenance, startup or shutdown (collectively, "MSS") or upsets.  *See* 70 Fed. Reg. 16,130 (Mar. 30, 2005) (granting limited approval of Texas's then-existing MSS provisions) ("Upon expiration of the provisions, all

emissions in excess of the applicable emission limitations during SSM activities remain violations of the Texas SIP, subject to enforcement actions by the State, EPA or citizens."); 75 Fed. Reg. 68,993 (Nov. 10, 2010) (approving the current affirmative defense to excess emissions during unplanned MSS and disapproving same for excess emissions during planned MSS, effective January 10, 2011) ("Previously approved provisions that addressed excess emissions expired from the SIP on their own terms as of July 1, 2006."); 75 Fed. Reg. 68,993 ("the existing SIP does not contain affirmative defense provisions that provide relief in an action for penalties for any period of excess emissions").

31. The Court finds that the affirmative defense to civil penalties established by the current 30 Tex. Admin. Code § 101.222(d) and (e) does not apply to Defendants' violations that predate January 10, 2011.

32. Texas submitted 30 Tex. Admin. Code § 101.222(a)-(g), providing *inter alia* an affirmative defense to penalties for unlawful excess emissions caused by a variety of planned and unplanned events, to EPA for inclusion in the SIP.  On November 10, 2010, EPA approved the portion of the rule providing an affirmative defense to penalties for unlawful emissions caused by upsets and unplanned startups, shutdowns, and malfunctions, including section 101.222(d) and (e); but EPA disapproved the portion of the State's proposed SIP revision that would have provided a defense to penalties for unlawful emissions during planned startups, shutdowns, and maintenance.  This rule became effective January 10, 2011.  75 Fed.Reg. 68989.

33. At all times relevant to this case, there was no defense in the EPA-approved Texas SIP for violations due to planned startup, shutdown, or maintenance activities. *See Luminant Generation Co. LLC v. U.S. E.P.A.*, 714 F.3d 841 (5th Cir. 2013) (upholding EPA's

20

disapproval of 30 Tex. Admin. Code § 101.222(h)-(j) which contains an affirmative defense for violations during planned MSS activities).  To date, there is still none.

34. The affirmative defense for upsets and unplanned MSS cannot relieve Defendants of liability for their violations or injunctive relief.  See, e.g., 30 Tex. Admin. Code § 101.222(e) ("Excess opacity events . . . that result from an unplanned maintenance, startup, or shutdown activity . . .  are subject to an affirmative defense to all claims in enforcement actions brought for these activities, other than . . . actions for injunctive relief, for which the owner or operator proves the opacity resulted from an unplanned maintenance, startup, or shutdown activity . . . and all of the following [demonstration criteria] . . ."); *Luminant Generation*, 714 F.3d at 852-53 ("[E]ven if . . . the violator establishes the applicability of the approved affirmative defense, injunctive relief is still available.").

35. The Court also finds that Defendants have not met their burden of demonstrating that each MSS opacity exceedance meets the affirmative defense to civil penalties.

DEFERENCE

36. Where the issue presented is a challenge to an agency's interpretation of its own ambiguous regulation, courts defer to that interpretation unless it is "plainly erroneous or inconsistent with the regulation."  *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see Belt v. Emcare, Inc.*, 444 F.3d 403, 408 (5th Cir. 2006).  Defendants would have this Court extend *Auer* deference to TCEQ's factual findings in investigation reports that are not reviewable final agency actions because they are issued as part of the agency's discretionary enforcement authority. The Court declines to do so.  TCEQ is not interpreting its own ambiguous regulation in issuing these reports.  The demonstration criteria for the affirmative defense are not

21

ambiguous.  Further, the criteria have been incorporated into the federally approved Texas SIP, and EPA's interpretation of the criteria is controlling, not TCEQ's.

37. The CAA empowers citizens to bring independent suits if they discover violations of the CAA.  42 U.S.C. § 7604.  Specifically, citizens can bring their own enforcement action "against any person . . . who is alleged to have violated . . . or to be in violation of . . . an emission standard or limitation under this chapter."  *Id*. § 7604(a)(1).

38. The Fifth Circuit recognizes that SIPs requirements can be enforced by citizens under the CAA.  *BCCA App. Grp. v. E.P.A.*, 355 F.3d 817, 838 n.25 (5th Cir. 2003).  The legislative history of the CAA shows that "Congress intended citizen suits to both goad the responsible agencies to more vigorous enforcement of the anti-pollution standards, and if the agencies remained inert, *to provide an alternate enforcement mechanism*."  *Baughman*, 592 F.2d at 218 (citing S. Rep. No. 1196, 91st Cong., 2d Sess. 2, 35–36 (1970)) (emphasis added).  In allowing citizens to serve as their own "private attorneys general," Congress intended that courts serve as alternative enforcers of the CAA, thus imposing on courts a "clear and unmistakable" duty to examine potential CAA violations brought to light by citizens.  *Friends of the Earth v. Carey*, 535 F.2d 165, 173 (2d Cir. 1976).

39. TCEQ's decision not to pursue enforcement against Defendants for the opacity exceedances does not affect this suit's viability.  *See Ass'n to Protect Hammersly v. Taylor Res.*, 299 F.3d 1007, 1014 (9th Cir. 2002).  TCEQ does not have exclusive authority to decide whether Luminant is violating the CAA.  *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 566-67 (5th Cir. 1996) (holding that courts may determine in citizen suits whether a private actor violated a federal agency regulation); *see also Ass'n to Protect Hammersly*, 299 F.3d at 1012 (holding that state inaction is not a barrier to proper citizen suit

to enforce CWA); *Abbott v. BP Exploration & Prod. Inc.*, 781 F. Supp. 2d 453, 468 (S.D. Tex. 2011) (holding that a district court has separate authority under another environmental statute's citizen suit provision to enforce the statute even where federal agency has declined to enforce and is not a party).

40. Further, this Court finds that TCEQ allowed Luminant to utilize the affirmative defenses despite Luminant's continued and clear emissions violations.  The Fifth Circuit in *Luminant* upheld EPA's approval of the Texas SIP revision in part because "the narrowly tailored affirmative defense presents a **high burden** for any company seeking entitlement to it."  714 F.3d at 854 (emphasis added).  In interpreting the affirmative defenses so loosely and without any real investigation into the underlying numerous opacity events, TCEQ is acting contrary to these portions of its SIP.

41. This Court will not expand *Auer* deference to agency fact-findings in a discretionary enforcement decision where the agency determined not to enforce and Congress has provided citizens a separate enforcement tool before the Federal courts as a backstop to agency inaction.

INJUNCTION

42. Defendants' CAA violations at Martin Lake support issuance of an injunction requiring compliance with the opacity limit and heat input rate limit.  *See St. Bernard Citizens for Envtl. Quality, Inc.*, 354 F. Supp. 2d 697, 705 (E.D. La. 2005) (finding that "plaintiffs' unrebutted evidence of repeated violations, including at least one that occurred after plaintiffs filed suit" would justify injunction); *Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 936 (7th Cir. 2008) (upholding district court's injunction because the court "agree[d] with the Sierra Club that requiring the Company to obtain a valid PSD permit

23

would likely result in decreased emissions and improved public health, which would further a stated goal of the Clean Air Act.").

43. A party seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 626-27 (5th Cir. 2013) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Under Texas law, the irreparable harm required for a permanent injunction is defined as "an injury which cannot be compensated or for which compensation cannot be measured by any certain pecuniary standard."  *Molex, Inc. v. Nolen*, 759 F.2d 474, 477 (5th Cir. 1985) (citation and internal quotations omitted).

44. The excess pollution caused by the violations at Martin Lake causes the air to be "less pure than mandated by the Clean Air Act," and increasing the risk to public health.  *See Texans United*, 207 F.3d at 792 (concluding that a plaintiff will suffer injury if compelled to breath air less pure than that mandated by the CAA) (citing *NRDC v. EPA,* 507 F.2d 905, 910 (9th Cir.1974).  No additional proof of injury is required.

45. Sierra Club alleges environmental harm and increased health concerns caused by Defendants' CAA violations at Martin Lake.  These are the kinds of harms envisioned by the Supreme Court in *Amoco*, 480 U.S. 531, where it held that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.  If such injury is sufficiently likely, therefore, the

balance of harms will usually favor the issuance of an injunction to protect the environment." *Id*. at 545.

46. The district court in *North Carolina v. TVA*, 593 F. Supp. 2d 812, 812 (W.D.N.C. 2009), *rev'd on other grounds*, 615 F.3d 291 (4th Cir. 2010), held that "at a minimum, there is an increased risk of incidences of premature mortality in the general public associated with [fine particulate matter] exposure, even for levels at or below the [annual] [National Ambient Air Quality Standard] standard of 15ug/m3."

47. In addition, heat input rate limit permit requirements in the Martin Lake permit restrict emissions of a variety of harmful pollutants from the smokestacks at the Martin Lake plant, including particulate matter, sulfur dioxide, and mercury. Violations of opacity and heat input limits increase this pollution in the area around the Martin Lake power plant.

48. In addition, in *Marine Shale Processors*, the Fifth Circuit recognized that courts may issue "an injunction without making findings of irreparable harm, inadequacy of legal remedy, or the balance of convenience, provided that traditional equitable principles permit such a course of action." 81 F.3d at 1358. The court considered two such traditional principles of equity in that case – willfulness and protecting the public interest. Both traditional principles of equity are present here and support the issuance of an injunction.

49. The court discussed two traditional principles of equity that were relevant to the case and held that "a court need not balance the hardship when a defendant's conduct has been willful." Id. at 1358. The court found that this traditional principle of equity may relieve a court of its normal obligation to balance the equities when dealing with a defendant who has willfully and repeatedly violated the environmental laws. Id. at 1359. Defendants have

25

willfully and repeatedly violated the CAA with its opacity and heat input rate limit violations at Martin Lake.

50. The court also found that "when the United States or a sovereign state sues in its capacity as protector of the public interest, a court may rest an injunction entirely upon a determination that the activity at issue constitutes a risk of danger to the public." *Id.* As a CAA citizen suit plaintiff, Sierra Club acts as a "private attorney general" to enforce the Clean Air Act and, as the phrase implies, seeks relief not on its own behalf but on behalf of society as a whole. *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004); *see Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 531 (5th Cir. 2008) (recognizing that citizen suit plaintiff's concrete interest in the outcome of Clean Water Act litigation was the public's interest, not an interest specific to the plaintiff organization or its members). Therefore, this equitable principle also supports the issuance of an injunction without requiring a finding of irreparable harm or balancing the hardships.

MOOTNESS

51. Sierra Club's opacity claim is not moot. The December 16, 2011 minor permit modification to Permit No. 933 purports to authorize opacity exceedances during a subset of planned startup, shutdown, and malfunction ("SSM") events only.

52. The excess opacity emissions from upset or unplanned SSM events are continuing violations of the Texas SIP, and the minor permit modification cannot modify the federally approved Texas SIP.

53. Defendants' mere application for a revised Title V permit also cannot modify the federally approved Texas SIP.

PENALTIES

26

54. District courts have jurisdiction to apply any appropriate civil penalties in citizen suits.  42 U.S.C. § 7604(a).

55. Under the Clean Air Act, penalties may be assessed per day for each violation.  42 U.S.C. 7413(b).

56. The maximum penalty for violations of the Clean Air Act after before January 12, 2009 is $32,500.  40 C.F.R. § 19.4.  The maximum penalty for violations of the Clean Air Act after January 12, 2009 is $37,500.  40 C.F.R. § 19.4.

57. From July 1, 2006 to January 12, 2009, Defendants are liable for 14,089 violations of the 20 percent opacity limit at the Martin Lake Plant.  At a rate of $32,500 per violation, the maximum penalty for these violations is $457,892,500.  From January 12, 2009 through the end of 2012, Defendants are liable for 11,022 violations of the 20 percent opacity limit.  At a rate of $37,500 per violation, the maximum penalty for these violations is $413,325,000. Therefore, for the opacity limit violations for which Defendants are liable, the total maximum statutory penalty is $871,217,500.

58. From July 1, 2006 to January 12, 2009, Defendants are liable for 24,857 violations of the heat input limit.  At a rate of $32,500 per violation, the maximum penalty for these violations is $807,852,500.  From January 12, 2009, Defendants are liable for 6350 violations of the particulate matter limit.  At a rate of $37,500 per violation, the maximum penalty for the heat input limit violations after January 12, 2009 is $238,125,000.  Therefore, for the heat input limit violations for which Defendants are liable, the total maximum statutory penalty is $1,045,977,500.

59. In determining the amount of the penalty to be assessed in this case, the Court considers (in addition to such other factors as justice may require) the size of the business, the economic

impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation.  42 U.S.C. § 7413(e)(1).

60. In assessing penalties in this case, the Court determines that it is appropriate to assess the maximum penalty and adjust downwards based on the penalty assessment criteria of 42 U.S.C. § 7413(e)(1*). United States v. Midwest Suspension and Brake*, 824 F.Supp. 713, 735 (E.D. Mich. 1993), *aff'd* 49 F.3d 1197 (6th Cir. 1995); *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990).

61. The size of Defendants' business provides no basis to reduce the maximum penalty under 42 U.S.C. § 7413(e)(1).

62. The economic impact of the penalty on Defendants provides no basis to reduce the maximum penalty under 42 U.S.C. § 7413(e)(1).

63. There is no basis to reduce the maximum penalty based on Defendants' compliance history with the Clean Air Act or any good faith efforts to comply.  42 U.S.C. § 7413(e)(1).

64. Violations at the plant have continued for many years.  Thus the "duration of the violations" criterion, 42 U.S.C. § 7413(e)(1), provides no basis to reduce the maximum penalty.

65. Defendants have not established that they previously paid penalties for the same violations at issue in this proceeding.  Therefore, no reduction in the maximum penalty is appropriate for this criterion under 42 U.S.C. § 7413(e)(1).

66. By contributing to higher concentrations of particulate matter in the air surrounding and downwind of the Martin Lake plant, the violations present health risks and are therefore

28

serious under 42 U.S.C. § 7413(e)(1). Therefore, there is no basis to reduce the maximum penalties based on the seriousness of the violations.

67. Given the significant economic benefit derived by Defendants under either of the non-compliance scenarios discussed by Plaintiff's expert, Mr. Ewen, there is no basis to reduce the maximum penalty based on Defendants' economic benefit of noncompliance.

68. While the Court, in its discretion, may award the maximum statutory penalties described above, the Court finds that a penalty of $147.3 million, or three times the economic benefit calculated with reference to delayed capital expenditures, is appropriate.

69. The Court, further in the exercise of its discretion, delays imposition of 70% of such penalties subject to Defendants timely compliance with the injunctive relief ordered herein. The remaining 30% is hereby imposed and it is ORDERED that such amount shall be paid by the Defendants not later than 30 days after this Order becomes final.

70. The Court further finds that the continuation of the violations and attendant air pollution found herein should be restrained and enjoined by this Court's order; it is Therefore, ORDERED THAT Defendants are enjoined from further operation of the Martin Lake power plant in violation of the opacity and heat input limits challenged herein.

Dated: April 9, 2014                              Respectfully submitted,

/s/ Charles McPhedran
Charles McPhedran
PA State Bar No. 60123
Mary Whittle
TX State Bar No. 24033336
EARTHJUSTICE
1617 JFK Boulevard, Suite 1675
Philadelphia, PA 19103
Tel: (215) 717-4521
Fax: (212) 918-1556
Email: cmcphedran@earthjustice.org

Lisa K. Perfetto (admitted pro hac vice)
NY State Bar No. 5018353
EARTHJUSTICE
48 Wall Street, 19th Floor
New York, NY 10038
Tel: (212) 845-7388
Fax: (212) 918-1556
Email: lperfetto@earthjustice.org

Ilan Levin (admitted pro hac vice)
TX State Bar No. 00798328
ENVIRONMENTAL INTEGRITY PROJECT
1303 San Antonio Street, Suite 200
Austin, TX 78701
Tel: (512) 637-9479
Fax: (512) 584-8019
Email: ilevin@environmentalintegrity.org

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on counsel via the ECF filing system on

April 9, 2014.

/s/ Charles McPhedran
Charles McPhedran
Counsel for Sierra Club